UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------------X
ROBERT M. RUBIN,

                       Plaintiff,

        -against-

ROBERT HODES, COST CONTAINMENT
GROUP, INC., TRACY BOURANDAS,
COST CONTAINMENT GROUP, INC.
EMPLOYEE STOCK OWNERSHIP PLAN,
WILMINGTON TRUST RETIREMENT AND
INSTITUTIONAL SERVICES COMPANY, Itself,
and as Trustee of the Cost Containment Group, Inc.
Employee Stock Ownership Trust,
UHP-DELAWARE, INC., a/k/a United Health
Programs of America, Inc., PATRIOT HEALTH,
INC. and JOHN DOES 1 through 10,

                     Defendants.
--------------------------------------------------------X

FILED
CLERK

1/13/2020 1:25 pm

U.S. DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
LONG ISLAND OFFICE

**ORDER**
18-CV-7403 (SJF)(AKT)

FEUERSTEIN, District Judge:

## I.    Introduction

On or about August 25, 2018, plaintiff Robert M. Rubin ("plaintiff" or "Rubin")

commenced this action against (i) defendants Robert Hodes ("Hodes"), Cost Containment

Group, Inc. ("CCG"), and Tracy Bourandas ("Bourandas") (collectively, the "CCG

Defendants"); (ii) defendants Cost Containment Group, Inc. Employee Stock Ownership Plan

("ESOP") and Wilmington Trust Retirement and Institutional Services Company ("WTRISC")[1],

itself and as trustee of the Cost Containment Group, Inc. Employee Stock Ownership Trust (the

"Trust") (collectively, the "Removing Defendants"); and (iii) defendants UHP-Delaware, Inc.

("UHP"), a/k/a United Health Programs of America, Inc., Patriot Health, Inc. ("Patriot Health"),

---

[1] Wilmington Trust, N.A. ("Wilmington") is the successor-in-interest to WTRISC. (Notice of Removal ["NOR"] at 1 n. 1).

1

and several unidentified defendants designated as "John Does 1-10," in the Supreme Court of the State of New York, County of Nassau ("the state court"), asserting claims, *inter alia*, seeking damages and equitable relief for fraudulent inducement, aiding and abetting fraud, securities fraud and payment on certain promissory notes. On December 27, 2018, the Removing Defendants filed a notice of removal removing the action to this Court pursuant to 28 U.S.C. § 1441(a) on the basis that this Court has original subject matter jurisdiction over plaintiff's state law claims against them because they are preempted by the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001, *et seq.* Pending before the Court is plaintiff's motion to remand this action to the state court pursuant to 28 U.S.C. § 1447(c). For the reasons set forth below, plaintiff's motion is granted.

## II.    Background

### A.  Factual Allegations in the First Amended Complaint[2]

The first amended complaint ("FAC") alleges, *inter alia*, (i) "[u]pon information and belief," that UHP was incorporated in 1992 and "is a predecessor in interest to CCG[,] or has been treated by CCG as a predecessor in interest to CCG," (FAC, ¶ 14); (ii) that beginning in or about 1993, plaintiff "became associated with UHP[,] . . . restructured and funded UHP[,] and performed other services on behalf of UHP," as a result of which he became "the majority shareholder of UHP, owning at least eighty-five (85%) percent of the common shares of UHP," (*id.*, ¶ 16); (iii) that from in or about 1993 through 2004, plaintiff "was a director of UHP and . . . remained as a director thereafter," (*id.*, ¶ 21); (iv) that "[a]ccording to the corporate filings with the State of Delaware Secretary of State, Division of Corporations, UHP is only authorized to

---

[2] For purposes of this motion, the factual allegations in the first amended complaint are assumed to be true; they do not constitute findings of fact by the Court.

2

issue common shares and is not[,] and has never been[,] authorized to issue preferred shares," (*id.*, ¶ 17; *see also Id.*, ¶ 138); and (v) that in or about July 1996, plaintiff loaned UHP the sum of two hundred fifty thousand dollars ($250,000.00), with interest at eleven percent (11%) per annum, which is evidenced by a promissory note (the "UHP Loan"). (*Id.*, ¶ 28).

The FAC further alleges, *inter alia*, (i) "upon information and belief," (A) that Patriot Health was incorporated in 2001 and "has been treated as an affiliate or wholly owned subsidiary of UHP," (FAC, ¶ 23), and (B) that from in or about 2001 through the present, Hodes was the chief executive officer ("CEO"), and Hodes and Bourandas were directors and "exercised control," of UHP and Patriot Health, (*id.*, ¶¶ 18, 20, 22, 24, 25, 27); (ii) that from in or about 2001 through 2004, plaintiff "was a director of Patriot Health and . . . remained as a director thereafter," (*id.*, ¶ 26); (iii) that on or about February 15, 2001, plaintiff loaned Patriot Health the sum of one hundred thousand dollars ($100,000.00), with interest at eleven percent (11 %) per annum, which is evidenced by a promissory note (the "Patriot Health Loan"), (*id.*, ¶ 29); (iv) that by letter dated March 1, 2005, Hodes, UHP and UHP's auditor "confirmed that the records of UHP reflected that at year end, December 31, 2004, UHP owed Rubin $100,000 in principal on the UHP Loan and that no interest had been paid," (*id.*, ¶ 30); and (v) that by letter of that same date, Hodes, Patriot Health and "UHP's and Patriot Health's auditor[] confirmed that the records of Patriot Health reflected that at year end, December 31, 2004, Patriot Health owed Rubin $89,788 in principal on the Patriot Health Loan and that no interest had been paid." (*Id.*, ¶ 31).

The FAC also alleges, *inter alia*, "[u]pon information and belief," (i) that Hodes and Bourandas "caused CCG to be formed and incorporated" in or about August 2005, and controlled CCG "from its inception to at least September 2012," (FAC, ¶¶ 39-40); (ii) that CCG "is in the business of providing medical savings programs, serving to discount medical, dental,

chiropractic and other services to its members," (*id.*, ¶ 13); (iii) that Bourandas, "[a]t all times mentioned[,] was and is an officer of CCG, UHP and Patriot Health," (*id.*, ¶ 19); (iv) that "shares of CCG were initially issued to Hodes and Bourandas[,] and Rubin received no shares of CCG," (*id.*, ¶ 41); (v) that Hodes and Bourandas formed CCG for the purpose of acquiring the businesses of UHP and Patriot Health "to the exclusion of Rubin," (*id.*, ¶ 42); (vi) that "in or about August 2005, Hodes and Bourandas began conducting the business of UHP and Patriot Health under CCG," (*id.*, ¶ 43); and (vii) and that from in or about August 2005 through the present, CCG "acted as if it acquired the business, . . . assets . . . [and] shares or equity of UHP and Patriot Health[,] . . . [and] treated UHP and Patriot Health as if it had acquired the assets . . . [and] shares or equity of UHP and Patriot Health." (*Id.*, ¶¶ 44-45). However, according to plaintiff, "the purported CCG 2005 acquisition of both UHP and Patriot Health . . . was never undertaken, let alone consummated," and "no valid documentation exists" therefor, (*id.*, ¶¶ 96-97, 99); and Rubin "never endorsed his shares of UHP to CCG or even knew of the CCG acquisition of UHP and Patriot Health." (*Id.*, ¶ 98).

In addition, plaintiff alleges, *inter alia*, (i) "[u]pon information and belief," that from in or about 2002 through the present, no meetings of the board of directors of UHP and Patriot Health were either held or "duly noticed," (FAC, ¶¶ 32-35); and (ii) that even though he was a director, creditor, shareholder and majority shareholder of UHP, and a director and creditor of Patriot Health, he never received notice of a UHP shareholders meeting; of "any merger, sale of the shares or sale of the assets of" UHP or Patriot Health; or "that the business, the assets or the equity or shares of UHP and Patriot Health were to be transferred[,] were being transferred to[,] or had been transferred to CCG." (*Id.*, ¶¶ 36-38, 46; *see also Id.*, ¶ 47 [alleging that no such notice was ever sent to plaintiff from CCG, Hodes or Bourandas]). According to plaintiff, he

never sold, transferred or exchanged his shares of UHP to or for shares of CCG, (*id.*, ¶¶ 48, 136); and "[f]rom in or about 2002 through August 2012, [he] had very little contact with Hodes, Bourandas, UHP or Patriot Health[,] and was never advised as to the state of the business of UHP and Patriot Health." (*Id.*, ¶ 49). Plaintiff also alleges, "[u]pon information and belief," that "from in or about 2002 through in or about August 2012, [he] believed that UHP and Patriot Health were in business, but were not doing well and were not profitable." (*Id.*, ¶ 50).

Plaintiff further alleges, *inter alia*, "[u]pon information and belief," (i) that the ESOP "is an employee stock ownership plan created for the benefit of the employees of CCG and other entities owned or controlled by CCG," (FAC, ¶ 6); (ii) that the Trust was established in 2012 "specifically to purchase a majority interest in the equity of CCG on behalf of the ESOP," (*id.*, ¶ 8); (iii) that Wilmington acted as trustee of the Trust, (*id.*, ¶ 7); (iv) that Hodes and CCG misrepresented to the ESOP and Wilmington that CCG had acquired UHP and Patriot Health, (*id.*, ¶¶ 100-101); and (v) that "[b]ut for such misrepresentation . . . the ESOP Purchase of CCG shares would not have occurred." (*Id.*, ¶ 102).

According to plaintiff, in or about August 2012, after having no contact with him "for many years," Hodes: (i) advised him (A) that CCG, "the successor to and new name of UHP[,] . . . had been very successful the past several years and that Rubin's stock interest in [the company] had become valuable," (FAC, ¶ 51), (B) "that an employee stock ownership plan, composed of the employees of [CCG] had almost completed the purchase of the stock of [CCG] or most of the stock of [CCG] for about $32,000,000 (the 'ESOP Purchase') and that Rubin's share of the purchase was about $2,650,000," (*id.*, ¶ 53), and (C) "that the net, fair market value of [CCG] was $40,000,000," (*id.*, ¶ 54); and (ii) led him to believe (A) that CCG "was the same corporate entity as UHP, and that UHP was operating under the name Cost Containment Group, rather than

under its former names," (*id.*, ¶ 52), and (B) "that his shares of UHP were being offered for sale, along with the shares of Hodes and one other person." (*Id.*, ¶ 55; *see also Id.*, ¶¶ 111, 145). According to plaintiff, at that time he "had no knowledge that CCG existed as a separate corporation distinct from UHP, especially since [he] had never received shares of CCG or had ever transferred his shares of UHP." (*Id.*, ¶ 56).

In or about September 2012, when Rubin questioned Hodes about why his equity interest in CCG was so small, Hodes responded that it was because a few years earlier, he "had purchased a significant amount of debt held by a certain creditor of UHP and, thereafter, had converted such debt into equity of UHP for himself, which represented approximately 85% of the equity of UHP and that Rubin's interest in [CCG] had been substantially diluted as a result." (FAC, ¶ 57; *see also Id.*, ¶¶ 111, 145). "Hodes, without further explanation, then advised Rubin that he was entitled to about $6,000,000 from the $32,000,000 ESOP purchase of most of the equity of [CCG]." (*Id.*, ¶ 58). The ESOP Purchase "was through the means of notes from the ESOP or its trustee to Hodes, Rubin and Margery Rubin, as well as to one other person." (*Id.*, ¶ 68).

Rubin believed Hodes because he knew him; he "was aware that there was an investor in UHP, who, prior to 2000, invested in the form of a loan[;] . . . [he] believed that UHP had not been doing well . . . [and, thus,] believed that Hodes, after acquiring such debt, could have converted it into a majority interest in UHP because the price per share would have been very low[;] . . . [and] he believed that if Hodes was acting in bad faith, he would never have told him of the ESOP purchase of [CCG] and/or would have diluted Rubin even more." (FAC, ¶¶ 59-62).

According to plaintiff, "[f]or purposes of the ESOP Purchase, [he] assigned one-quarter of his interest in UHP to Margery Rubin ['Margery']," (FAC, ¶ 65), but Margery assigned "any

and all claims she may have regarding the ESOP Purchase, as well as any and all claims against the Defendants" to him. (*Id.*, ¶ 67). In purported reliance upon Hodes's representations, Rubin and Margery executed the ESOP Purchase Documents, "accepted notes from the ESOP and Wilmington in the amount of approximately $6,105,000, less a pre-payment[,]" and "acknowledged to the ESOP and Wilmington that they had no shares of [CCG] after receiving the notes for $6,105,000." (*Id.*, ¶¶ 69, 110).

Plaintiff alleges, upon information and belief, *inter alia*, (i) that "the ESOP Purchase was a scheme by Hodes to cash out a portion of his equity for at least $25,000,000, while maintaining a 20% equity interest in CCG and the contingent contractual right to a acquire [sic] majority interest in CCG[,]" (FAC, ¶ 107); and (ii) that "based upon CCG's ability to pay out $32,000,000, after taxes, on the notes to purchase the CCG shares, plus interest, over approximately a 4 year period, CCG had a market value of at least $200,000,000, rather than the $40,000,000 represented in the ESOP Purchase." (*Id.*, ¶ 108). According to plaintiff, the CCG Defendants and the Removing Defendants misrepresented the market value of CCG to him as being forty million dollars ($40,000,000.00), and/or concealed from him that the actual market value of CCG was at least two hundred million dollars ($200,000,000.00)[3]. (*Id.*, ¶¶ 109, 111, 145). Plaintiff alleges that his "equity interest in UHP and/or CCG, in or about September 2012 was worth at least $170,000,000," (*id.*, ¶ 112), and, thus, he "sustained damages in the amount of at least $163,895,000. . . ." (*Id.*, ¶¶ 113, 121).

---

[3] Plaintiff also alleges, upon information and belief, that the Removing Defendants (i) "were aware of [Hodes's and Bourandas's] misrepresentations and acts, especially the misrepresentation [as to] the market value of CCG[,] . . . [and] that there was no or insufficient documentation that CCG had acquired the equity or assets of UHP and Patriot Health," (FAC, ¶¶ 117-118; *see also Id.*, ¶¶ 128-132); and (ii) "required that CCG obtain the consent of Rubin to the ESOP Purchase, knowing that [the CCG Defendants] were trying to exclude Rubin from the ESOP Purchase, while concealing . . . information and knowledge from Rubin and knowing that the ESOP Purchase Documents executed by Rubin and Margery Rubin were executed based upon false information." (*Id.*, ¶ 119).

Plaintiff alleges, "[u]pon information and belief," that on or about September 5, 2012, Hodes and Bourandas caused UHP Acquisition Corp. ("UHPAC") to be formed and incorporated, (FAC, ¶ 92), "for the purposes of acquiring the equity or assets of UHP and completing the ESOP Purchase of CCG shares, all to the detriment of Rubin." (*Id.*, ¶ 94). However, according to plaintiff, "[i]nstead of using [UHPAC], Hodes and Bourandas were able to complete the ESOP [P]urchase . . . by fraudulently inducing Rubin to execute the documents consummating the ESOP Purchase of CCG shares (the 'ESOP Purchase Documents')." (*Id.*, ¶ 95; *see also Id.*, ¶ 114).

"In 2017, payments on the notes securing the ESOP Purchase were completed to Rubin and Margery Rubin, who received principal in the amounts of approximately $4,495,000 and $1,610,000, respectively, . . . [and] interest in the amounts of approximately $283,000 and $101,000, respectively." (FAC, ¶ 71). In or about August of that same year, plaintiff inquired of Hodes and CCG as to the amounts he was still owed on the UHP Loan and the Patriot Health Loan (collectively, the "Loans") and when those notes would be paid. (*Id.*, ¶ 72). According to plaintiff, Hodes initially told him that the Loans had been paid, but when he was unable to provide any evidence of payment, he subsequently advised Rubin that the Loans "had been converted to shares of UHP and Patriot Health in 2004." (*Id.*, ¶¶ 73-74).

By email dated August 14, 2017, Hodes provided plaintiff with "a copy of the minutes of a purported board of directors meeting of UHP held on December 31, 2014 [sic] [the 'BOD Minutes'],"[4] which plaintiff contends are fictitious and fraudulent. (FAC, ¶¶ 75, 85, 111, 115, 145). The BOD Minutes, which contain the purported unnotarized signatures of Hodes, Bourandas and Rubin, reflects, *inter alia*, (i) the conversion of Hodes's four hundred sixty-five

---

[4] The BOD Minutes are actually dated December 31, 2004. (*See* FAC, Ex. A).

thousand (465,000) shares of purported Preferred Stock of UHP, which allegedly had a fair market value of two dollars ($2.00) per share, to nine million three hundred thousand (9,300,000) of UHP's Common Stock, which purportedly had a fair market value of ten cents ($0.10) per share; (ii) the conversion of a debt UHP allegedly owed to Hodes for a loan in the outstanding aggregate principal amount of twelve thousand dollars ($12,000.00), plus accrued interest thereon in the amount of fourteen thousand three hundred dollars ($14,300.00) (the "Hodes Debt"), to two hundred sixty-three thousand (263,000) shares of Common Stock of UHP; (iii) the conversion of UHP's debt to plaintiff for the UHP Loan in the outstanding aggregate principal amount of one hundred fifty thousand dollars ($150,000.00), plus accrued interest thereon in the amount of one hundred seventy-eight thousand seven hundred fifty dollars ($178,750.00) (the "Rubin Debt"), to three million two hundred eighty-seven thousand five hundred (3,287,500) shares of UHP's Common Stock "in full payment of the Rubin Debt and the accrued interest thereon;" and (iv) the conversion of one hundred seventy eight thousand dollars ($178,000.00) of a purported "outstanding liability [of UHP] to Hodes for unpaid compensation in the aggregate amount of" three hundred fifteen thousand thirty dollars ($315,030.00), to one million seventy hundred eighty thousand (1,780,000) shares of UHP's Common Stock to Hodes. (*Id.*, Ex. A). According to plaintiff, Hodes, thus, committed fraud in or about September 2012, when he allegedly misrepresented to Rubin that he had acquired his majority interest in the Common Stock of UHP by purchasing and acquiring debt, and then converting the debt. (*Id.*, ¶ 81). Plaintiff also claims, *inter alia*, that "[t]he preferred share transaction was fraudulent and fictitious, as well," (*id.*, ¶ 82); and that "during the time that Rubin was a board member of UHP, Hodes never received preferred shares and Rubin never authorized preferred shares to Hodes, and such preferred shares to Hodes was never authorized at a board meeting of UHP." (*Id.*, ¶ 87).

Plaintiff denies ever signing the BOD Minutes or having any knowledge of them until he received them from Hodes in or about October 2017. (*Id.*, ¶ 86).

B. Procedural History

On or about August 25, 2018, plaintiff commenced this action against the CCG Defendants, the Removing Defendants, UHP, Patriot Health and several defendants designated as "John Does 1-10," identified only as "individuals and entities who participated in the fraud alleged . . . or aided and abetted the fraud alleged," (FAC, ¶ 11), in the state court. (NOR, Ex. A). On or about October 15, 2018, plaintiff filed the FAC asserting claims, *inter alia*, (a) seeking compensatory damages in the sum of "at least" one hundred sixty-three million eight hundred ninety-five thousand dollars ($163,895,000.00) and punitive damages in the sum of one hundred million dollars ($100,000,000.00), with interest, as against the CCG Defendants and the Removing Defendants for fraud in the inducement (First Cause of Action); (b) seeking compensatory damages in the sum of "at least" one hundred sixty-three million eight hundred ninety-five thousand dollars ($163,895,000.00) and punitive damages in the sum of one hundred million dollars ($100,000,000.00), with interest, as against Bourandas, CCG and the Removing Defendants for aiding and abetting fraud (Second Cause of Action); (c) seeking judgment as against CCG and Hodes declaring that Rubin "is the owner of at least 85% of the common stock of UHP, with the ultimate number of shares of common stock owned by [him] to be determined by the Court[,]" (FAC, ¶ 143 and "Wherefore" Clause), (Third Cause of Action); (d) seeking damages in the sum of "at least" one hundred sixty-three million eight hundred ninety-five thousand dollars ($163,895,000.00), plus interest, and unspecified equitable relief as against Hodes and CCG for securities fraud under Section 10(b) of the Securities and Exchange Act of

1934 and Rule 10b-5 of the Securities and Exchange Commission (Fourth Cause of Action); and (e) seeking damages in the sum of "at least" two million two hundred thirty-seven thousand two hundred ninety-one dollars ($2,237,291.00), plus interest, as against UHP, and in the sum of "at least" nine hundred ninety-four thousand nine hundred sixteen dollars ($994,916.00), plus interest, as against Patriot Health based upon certain promissory notes (Fifth and Sixth Causes of Action, respectively).

On December 27, 2018, the Removing Defendants filed a notice of removal removing the action to this Court pursuant to 28 U.S.C. § 1441(a) on the basis that this Court has original subject matter jurisdiction over plaintiff's state law fraudulent inducement and aiding and abetting fraud claims against them because they are preempted by ERISA. According to the Removing Defendants, since "[t]he claims against the remaining defendants are not within the original or supplemental jurisdiction of the Court . . . [and] involve separate, unrelated, private transactions that long preceded the creation of the ESOP and the ESOP [P]urchase, . . . [they] should be severed and remanded to state court under 28 U.S.C. § 1441." (NOR, ¶ 5). The Removing Defendants further assert that "[p]ursuant to 28 U.S.C. § 1441, the non-removing defendants are not required to join in or consent to the removal of plaintiff's claims against Wilmington and the ESOP." (*Id.*, ¶ 8).

Plaintiff now moves to remand this action to the state court pursuant to 28 U.S.C. § 1447(c).

III.    Discussion

A.    Removal

The general removal statute provides: "Except as otherwise expressly provided by Act of Congress, any civil action brought in a State court of which the district courts of the United

States have original jurisdiction, may be removed by the defendant or the defendants, to the district court of the United States for the district and division embracing the place where such action is pending." 28 U.S.C. § 1441(a). "One category of cases of which district courts have original jurisdiction is '[f]ederal question' cases: cases 'arising under the Constitution, laws, or treaties of the United States.'" *Aetna Health Inc. v. Davila*, 542 U.S. 200, 207, 124 S. Ct. 2488, 159 L. Ed. 2d 312 (2004) (brackets in original) (quoting 28 U.S.C. § 1331). When a federal statute "completely pre-empts the state-law cause of action, a claim which comes within the scope of that cause of action, even if pleaded in terms of state law, is in reality based on federal law[,]" and may be removed to federal court. *Id.* at 207-08, 124 S. Ct. 2488; *accord Arditi v. Lighthouse Int'l*, 676 F.3d 294, 298 (2d Cir. 2012).

The Removing Defendants, "as the party seeking removal and asserting federal jurisdiction, bear[] the burden of demonstrating that the district court has original jurisdiction." *McCulloch Orthopaedic Surgical Servs., PLLC v. Aetna Inc.*, 857 F.3d 141, 145 (2d Cir. 2017).


B.    ERISA

The Removing Defendants contend, *inter alia*, that removal was proper because "the claims asserted against [them] relate solely to an Employee Stock Ownership Plan and are expressly pre-empted by ERISA." (Def. Mem. at 1). Plaintiff's claims against the Removing Defendants seek damages for injuries allegedly suffered by him as a result of the allegedly improper sale of his shares of CCG, "which was effectuated through the purchase of shares by the company's [ESOP], allegedly for less than fair market value, with the assistance of the ESOP Trustee." (NOR, ¶ 2; *see also* Removing Defendants' Memorandum of Law in Opposition to Plaintiff's Motion to Remand ["Def. Mem."] at 2). The essence of plaintiff's claims against the Removing Defendants is (i) that the Removing Defendants defrauded plaintiff, or aided and

abetted the CCG Defendants' fraud upon him, by, *inter alia*, purportedly misrepresenting the

market value of CCG to him as being forty million dollars ($40,000,000.00), as opposed to two

hundred million dollars ($200,000,000.00), and concealing pertinent information from him; and

(2) that in reliance thereon, plaintiff consented to the ESOP Purchase and executed the ESOP

Purchase Documents to his detriment.

"Congress enacted ERISA to 'protect ... the interests of participants in employee benefit

plans and their beneficiaries' by setting out substantive regulatory requirements for employee

benefit plans and to 'provid[e] for appropriate remedies, sanctions, and ready access to the

Federal courts.'" *Davila*, 542 U.S. at 208, 124 S. Ct. 2488 (quoting 29 U.S.C. § 1001(b)).

"ERISA's comprehensive legislative scheme includes an integrated system of procedures for

enforcement[,] . . . ERISA § 502(a), 29 U.S.C. § 1132(a), [which] is . . . essential to accomplish

Congress' purpose of creating a comprehensive statute for the regulation of employee benefit

plans." *Id.* (quotations and citations omitted).

Pursuant to Section 502(a) of ERISA,

> "[a] civil action may be brought-- (1) *by a participant or beneficiary*-- (A) for the
> relief provided for in subsection (c) of this section[5], or (B) to recover benefits due
> to him under the terms of his plan, to enforce his rights under the terms of the plan,
> or to clarify his rights to future benefits under the terms of the plan; (2) *by the
> Secretary [of Labor], or by a participant, beneficiary or fiduciary* for appropriate
> relief under section 1109 of this title [establishing personal liability for breach of
> fiduciary duty[6]]; (3) *by a participant, beneficiary, or fiduciary* (A) to enjoin any act
> or practice which violates any provision of this subchapter or the terms of the plan,

---

[5] Subsection (c) of Section 502 of ERISA, *inter alia*, provides relief to a participant or beneficiary for an
administrator's refusal to supply certain requested information, or for an employer's failure to meet certain notice
requirements. 29 U.S.C. § 1132(c)(1), (3).

[6] Section 409 of ERISA provides, *inter alia*, that "[a]ny person who is a fiduciary with respect to a plan who
breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries by this subchapter shall be
personally liable to make good to such plan any losses to the plan resulting from each such breach, and to restore to
such plan any profits of such fiduciary which have been made through use of assets of the plan by the fiduciary, and
shall be subject to such other equitable or remedial relief as the court may deem appropriate, including removal of
such fiduciary. A fiduciary may also be removed for a violation of section 1111 of this title." 29 U.S.C. § 1109(a).

or (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of this subchapter or the terms of the plan; (4) *by the Secretary, or by a participant, or beneficiary* for appropriate relief in the case of a violation of 1025(c) of this title; (5) except as otherwise provided in subsection (b), *by the Secretary* (A) to enjoin any act or practice which violates any provision of this subchapter, or (B) to obtain other appropriate equitable relief (i) to redress such violation or (ii) to enforce any provision of this subchapter; (6) *by the Secretary* to collect any civil penalty under paragraph (2), (4), (5), (6), (7), (8), or (9) of subsection (c) or under subsection (i) or (*l*); (7) *by a State* to enforce compliance with a qualified medical child support order (as defined in section 1169(a)(2)(A) of this title); (8) *by the Secretary, or by an employer or other person referred to in section 1021(f)(1)*[7] *of this title*, (A) to enjoin any act or practice which violates subsection (f) of section 1021 of this title, or (B) to obtain appropriate equitable relief (i) to redress such violation or (ii) to enforce such subsection; (9) in the event that the purchase of an insurance contract or insurance annuity in connection with termination of an individual's status as a participant covered under a pension plan with respect to all or any portion of the participant's pension benefit under such plan constitutes a violation of part 4 of this title [footnote omitted] or the terms of the plan, *by the Secretary, by any individual who was a participant or beneficiary at the time of the alleged violation, or by a fiduciary*, to obtain appropriate relief, including the posting of security if necessary, to assure receipt by the participant or beneficiary of the amounts provided or to be provided by such insurance contract or annuity, plus reasonable prejudgment interest on such amounts; (10) in the case of a multiemployer plan that has been certified by the actuary to be in endangered or critical status under section 1085 of this title, if the plan sponsor-- (A) has not adopted a funding improvement or rehabilitation plan under that section by the deadline established in such section, or (B) fails to update or comply with the terms of the funding improvement or rehabilitation plan in accordance with the requirements of such section, *by an employer that has an obligation to contribute with respect to the multiemployer plan or an employee organization that represents active participants in the multiemployer plan*, for an order compelling the plan sponsor to adopt a funding improvement or rehabilitation plan or to update or comply with the terms of the funding improvement or rehabilitation plan in accordance with the requirements of such section and the funding improvement or rehabilitation plan; or (11) in the case of a multiemployer plan, *by an employee representative, or any employer that has an obligation to contribute to the plan*, (A) to enjoin any act or practice which violates subsection (k) of section 1021 of this title (or, in the case of an employer, subsection (l) of such section), or (B) to obtain appropriate equitable relief (i) to redress such violation or (ii) to enforce such subsection."

---

[7] Section 1021(f)(1) of title 29 provides, "The administrator of a defined benefit plan to which subchapter III applies shall for each plan year provide a plan funding notice *to the Pension Benefit Guaranty Corporation, to each plan participant and beneficiary, to each labor organization representing such participants or beneficiaries, and, in the case of a multiemployer plan, to each employer that has an obligation to contribute to the plan*." 29 U.S.C. § 1021(f)(1). (emphasis added).

29 U.S.C. § 1132(a)(emphasis added).

In order "to provide a uniform regulatory regime over employee benefit plans[,] . . . ERISA includes expansive pre-emption provisions, *see* ERISA § 514, 29 U.S.C. § 1144, which are intended to ensure that employee benefit plan regulation would be exclusively a federal concern." *Davila*, 542 U.S. at 208, 124 S. Ct. 2488 (quotations and citation omitted). Section 514(a) of ERISA provides, *inter alia*, that with exceptions not relevant here, the statute "shall supersede any and all State laws insofar as they may now or hereafter relate to any employee benefit plan described in section 1003(a) of this title and not exempt under section 1003(b) of this title." 29 U.S.C. § 1144(a).

"ERISA provides for two types of preemption: complete preemption under Section 502; and express preemption under Section 514." *Trundle & Co. Pension Plan v. Emanuel*, No. 18 Civ. 07290, 2019 WL 4735380, at * 3 (S.D.N.Y. Sept. 27, 2019); *see generally Wurtz v. Rawlings Co., LLC*, 761 F.3d 232, 238 (2d Cir. 2014). "[C]omplete preemption can be the basis for federal subject-matter jurisdiction, but express preemption cannot." *Wurtz*, 761 F.3d at 238; *see also Whitehurst v. 1199 SEIU United Healthcare Workers E.*, 928 F.3d 201, 208 (2d Cir. 2019) (distinguishing "ordinary or 'defensive' preemption as opposed to 'complete' or 'jurisdictional' preemption"); *Chau v. Hartford Life Ins. Co.*, 167 F. Supp. 3d 564, 570 (S.D.N.Y. 2016) ("'Complete preemption' can properly be described as a jurisdictional concept, . . . [and] can provide a federal court with subject matter jurisdiction over a state law claim brought in state court.")

"Express preemption is one of the 'three familiar forms' of ordinary defensive preemption (along with conflict and field preemption)." *Wurtz*, 761 F.3d at 238 (quoting *Sullivan v. Am. Airlines, Inc.*, 424 F.3d 267, 273 (2d Cir. 2005)). "It occurs when 'Congress ...

withdraw[s] specified powers from the States by enacting a statute containing an express preemption provision.'" *Id.* (alterations in original) (quoting *Arizona v. United States*, 567 U.S. 387, 399, 132 S. Ct. 2492, 2500-01, 183 L. Ed. 2d 351 (2012)). "As an ordinary defensive preemption claim, express preemption cannot support federal jurisdiction because it would not appear on the face of a well-pleaded complaint." *Id.*; *see also Briarpatch Ltd., L.P. v. Phoenix Pictures, Inc.*, 373 F.3d 296, 304 (2d Cir. 2004) ("Preemption does not necessarily confer jurisdiction, since it is generally a defense to plaintiff's suit and, as such, it does not appear on the face of a well-pleaded complaint. . . . It is only when based on the doctrine of 'complete preemption,' that the preemptive force of federal law is so 'extraordinary' that it converts an ordinary state common-law complaint into one stating a federal claim for purposes of the well-pleaded complaint rule.")

"In contrast, under the so-called 'complete preemption doctrine,' which is distinct from the three forms of defensive preemption, a plaintiff's state cause of action may be recast as a federal claim for relief, making its removal by the defendant proper on the basis of federal question jurisdiction." *Wurtz*, 761 F.3d at 238 (quotations, alterations and citation omitted); *see also Beneficial Nat'l Bank v. Anderson*, 539 U.S. 1, 8, 123 S. Ct. 2058, 156 L. Ed. 2d 1 (2003) ("[A] state claim may be removed to federal court [on preemption grounds] in only two circumstances—when Congress expressly so provides, such as in the Price–Anderson Act, [*see* 42 U.S.C. § 2210(n)(2)[8]], or when a federal statute wholly displaces the state-law cause of action through complete pre-emption. When the federal statute completely pre-empts the state-law

---

[8] "[T]he Price–Anderson Act contains an unusual pre-emption provision, 42 U.S.C. § 2014(hh), that not only gives federal courts jurisdiction over tort actions arising out of nuclear accidents but also expressly provides for removal of such actions brought in state court even when they assert only state-law claims." *Anderson*, 539 U.S. at 7, 123 S. Ct. 2058 (citing *El Paso Natural Gas Co. v. Neztsosie*, 526 U.S. 473, 484-85, 119 S. Ct. 1430, 143 L. Ed. 2d 635 (1999)).

cause of action, a claim which comes within the scope of that cause of action, even if pleaded in terms of state law, is in reality based on federal law. This claim is then removable under 28 U.S.C. § 1441(b), which authorizes any claim that 'arises under' federal law to be removed to federal court. In the two categories of cases where this Court has found complete pre-emption— certain causes of action under the LMRA and ERISA[9]—the federal statutes at issue provided the exclusive cause of action for the claim asserted and also set forth procedures and remedies governing that cause of action.")[10]. "In concluding that a claim is completely preempted, a federal court finds that Congress desired not just to provide a federal defense to a state law claim but also to replace the state law claim with a federal law claim and thereby give the defendant the ability to seek adjudication of the claim in federal court." *Wurtz*, 761 F.3d at 238 (quoting 14B *Fed. Prac. & Proc. Juris.* § 3722.2). "This does not mean simply that Congress intended the federal court to adjudicate a state law claim; rather, when a claim is completely preempted, 'the law governing the complaint is exclusively federal.'" *Id.* at 238-39 (quoting *Vaden v. Discover Bank*, 556 U.S. 49, 61, 129 S. Ct. 1262, 173 L. Ed. 2d 206 (2009)). In the absence of complete preemption, or an "alternative basis for subject-matter jurisdiction, it would be inappropriate to reach the merits of the ordinary express preemption defense." *Id.* at 239.

---

[9] *Anderson* found complete preemption in a third category of cases, *i.e.*, usury claims against national banks under Section 86 of the National Bank Act, 12 U.S.C. § 86. *Anderson*, 539 U.S. at 9-10, 123 S. Ct. 2058; *see also Briarpatch*, 373 F.3d at 305.

[10] A third "extremely rare" situation exists "in certain cases if the vindication of a state law right necessarily turns on a question of federal law." *Fracasse v. People's United Bank*, 747 F.3d 141, 144 (2d Cir. 2014). In such a case, "federal jurisdiction over a state law claim will lie if a federal issue is: (1) necessarily raised, (2) actually disputed, (3) substantial, and (4) capable of resolution in federal court without disrupting the federal-state balance approved by Congress." *Id.* (quoting *Gunn v. Minton*, 568 U.S. 251, 258, 133 S. Ct. 1059, 185 L. Ed. 2d 72 (2013)). "In *Gunn*, the Court explained that, to demonstrate substantiality, 'it is not enough that the federal issue be significant to the particular parties in the immediate suit' because 'that will *always* be true when the state claim "necessarily raise[s]" a disputed federal issue.' . . . Rather, the 'substantiality inquiry ... looks instead to the importance of the issue to the federal system as a whole.'" *Id.* (emphasis and alterations in original) (quoting *Gunn*, 568 U.S. at 260, 133 S. Ct. at 1066).

Since "the ERISA civil enforcement mechanism is one of those provisions with such extraordinary pre-emptive power that it converts an ordinary state common law complaint into one stating a federal claim for purposes of the well-pleaded complaint rule[,] . . . causes of action within the scope of the civil enforcement provisions of § 502(a) are removable to federal court." *Davila*, 542 U.S. at 209, 124 S. Ct. 2488 (quotations, alterations and citation omitted). "Section 502(a)(1)(B) of ERISA provides participants or beneficiaries with a civil remedy to recover benefits due under their plans, to enforce rights under their plans, or to clarify rights to future benefits under their plans." *Arditi*, 676 F.3d at 299 (citing ERISA § 502(a)(1)(B), 29 U.S.C. § 1132(a)). "Under the Supreme Court's test in *Davila*, ERISA preempts a cause of action where: (1) 'an individual, at some point in time, could have brought his or her claim under ERISA § 502(a)(1)(B);' and (2) 'no other independent legal duty ... is implicated by a defendant's actions.'" *Id.* (quoting *Davila*, 542 U.S. at 210, 124 S. Ct. 2488). "To avoid potential confusion under the first prong of *Davila*, this Court has further clarified that the plaintiff must show that: (a) he is the type of party who can bring a claim pursuant to § 502(a)(1)(B) of ERISA; and (b) the actual claim asserted can be construed as a colorable claim for benefits pursuant to § 502(a)(1)(B)." *Id.*

The term "beneficiary" is defined by ERISA as "a person designated by a participant, or by the terms of an employee benefit plan, who is or may become entitled to a benefit thereunder." 29 U.S.C. § 1002(8). Plaintiff clearly is not a "beneficiary" within the meaning of the statute.

ERISA defines the term "participant" to mean "any employee or former employee of an employer, or any member or former member of an employee organization, who is or may become eligible to receive a benefit of any type from an employee benefit plan which covers

employees of such employer or members of such organization, or whose beneficiaries may be eligible to receive any such benefit." 29 U.S.C. § 1002(7). The term "employee" is defined to mean simply "any individual employed by an employer." *Id.*, § 1002(6). Since there is no indication that plaintiff is or was an employee of CCG, he is not a "participant" in the ESOP within the meaning of ERISA. Accordingly, plaintiff is not the type of party who can bring a claim pursuant to § 502(a)(1)(B) of ERISA; nor can his claims against the Removing Defendants be construed as a colorable claim for benefits pursuant to § 502(a)(1)(B). Thus, the first prong of *Davila*'s test for complete preemption is not satisfied.

In addition to participants and beneficiaries, Section 502(a) provides certain civil remedies to a fiduciary, the Secretary of Labor, a State, an employer or other person referred to in 29 U.S.C. § 1021(f)(1), and certain other persons or entities in the case of a multiemployer plan. *See* 29 U.S.C. § 1132(a). Clearly, plaintiff is not the Secretary, a State or an employer or other person referred to in 29 U.S.C. § 1921(f)(1); nor is a multiemployer plan involved in this case.

ERISA defines the term "fiduciary" to mean, with exceptions not applicable here, a person who (i) "exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets, (ii) . . . renders investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or other property of such plan, or has any authority or responsibility to do so, or (iii) . . . has any discretionary authority or discretionary responsibility in the administration of such plan." 29 U.S.C. § 1002(21). Furthermore, under the statute, a fiduciary includes "any administrator, officer, trustee or custodian" of the plan, *id.*, § 1002(14)(A), and must "discharge his duties with respect to a plan solely in the interest of the

participants and beneficiaries and-- (A) for the exclusive purpose of: (i) providing benefits to participants and their beneficiaries; and (ii) defraying reasonable expenses of administering the plan. . . ." 29 USCA § 1104(a)(1)(A). Since there is no indication that plaintiff is or was a fiduciary within the meaning of ERISA, nor a participant or beneficiary thereof, he is not the type of party who can bring a claim pursuant to § 502(a) of ERISA. Accordingly, plaintiff's causes of action against the Removing Defendant are not within the scope of the civil enforcement provisions of § 502(a) and, thus, are not removable to federal court under the doctrine of complete preemption.

Moreover, the Removing Defendants do not even assert in their notice of removal that plaintiff's complaint asserts a cause of action within the scope of the civil enforcement provisions of § 502(a). Rather, the notice of removal asserts, in relevant part, that "[t]he ESOP transaction involving [the Removing Defendants] and plaintiff is governed by ERISA's prohibited transaction rules, 29 U.S.C. § 1106, and the applicable exemption under ERISA to those prohibited transaction rules found in 29 U.S.C. § 1108(e), which governs the acquisition by an ESOP of company stock. As to the plaintiff's claims related to the purchase price for his stock, ERISA directly governs those claims as ERISA requires that no more than 'adequate consideration' be paid for such stock, 29 U.S.C. § 1108(e), with adequate consideration defined as the 'fair market value of the asset as determined in good faith by the trustee….' 29 U.S.C. 1002(18)."[11] (NOR, ¶ 3; *see also* Def. Mem. at 2 and 9). However, plaintiff does not contend that

---

[11] As relevant here, § 406(a)(1)(A) and (D) of ERISA provides that a "fiduciary with respect to a plan shall not cause the plan to engage in a transaction, if he knows or should know that such transaction constitutes a direct or indirect ... (A) sale or exchange, or leasing, of any property between the plan and a party in interest; [or] . . . (D) transfer to, or use by or for the benefit of a party in interest, of any assets of the plan." 29 U.S.C. § 1106(a)(1). However, Section 406 of ERISA does not apply, *inter alia*, "to the acquisition or sale by a plan of qualifying employer securities (as defined in section 1107(d)(5) of this title) . . . (1) if such acquisition, [or] sale . . . is for adequate consideration, . . . (2) if no commission is charged with respect thereto, and (3) if-- (A) the plan is an eligible individual account plan (as defined in section 1107(d)(3) of this title). . . ." 29 U.S.C. § 1108(e). The term "adequate consideration" is defined, "in the case of an asset other than a security for which there is a generally

the Removing Defendants engaged in a transaction prohibited by Section 406 of ERISA; nor does he challenge the adequacy of the consideration the ESOP received from the sale of plaintiff's stock. To the contrary, plaintiff contends that defendants received more consideration than due them from their purportedly fraudulent undervaluation of plaintiff's stock. Such a claim is not redressable under Section 502(a) of ERISA.

Although the Removing Defendants contend in their opposition to plaintiff's motion to remand that plaintiff's claims against them "relate solely to their capacity as fiduciaries and administrators of the [ESOP], under 29 U.S.C. § 1132(a)(2)[,]" (Def. Mem. at 6), which provides a civil remedy to the Secretary, or a participant, beneficiary or fiduciary, for breach of a fiduciary duty under Section 409 of ERISA, 29 U.S.C. §§ 1109(a), plaintiff is not the type of party who can bring a claim pursuant to § 502(a)(2) of ERISA. Moreover, his claims against the Removing Defendants are not within the scope of Section 502(a)(2), nor do they impermissibly expand the exclusive remedies provided by Section 502(a) of ERISA.

The unreported case *Boyle v. SEIU Local 200 United Benefit Fund*, No. 5:15-cv-517, 2016 WL 3823007 (N.D.N.Y. July 12, 2016), upon which the Removing Defendants rely, is not binding on this Court and, in any event, is distinguishable. In that case, the plaintiffs were participants, beneficiaries and/or fiduciaries of the employee benefit plan at issue and they were challenging the defendant-Fund's administration of plan assets. Thus, unlike plaintiff, they were the type of party who could bring a claim pursuant to Section 502(a)(2) and their state law claims for unjust enrichment, wrongful withholding of contractual benefits, conversion and breach of fiduciary duty, *id.* at *2, fell within the scope of Section 502(a)(2) of ERISA.

---

recognized market, [as] the fair market value of the asset as determined in good faith by the trustee or named fiduciary pursuant to the terms of the plan and in accordance with regulations promulgated by the Secretary." 29 U.S.C. § 1002(18)(B).

Plaintiff's state law fraud claims against the Removing Defendants are not preempted by ERISA because they do not seek to recover benefits or enforce rights under an ERISA-regulated plan, and ERISA does not provide a remedy for the conduct upon which plaintiff bases his fraud claims. *See generally Davila*, 542 U.S. at 208, 124 S. Ct. 2488; *Montefiore Med. Ctr. v. Teamsters Local 272*, 642 F.3d 321, 327-28 (2d Cir. 2011). In other words, no existing ERISA provision targets the challenged conduct, nor is such conduct enforceable through 29 U.S.C. § 1132 or otherwise actionable under ERISA since, *inter alia*, it is not a suit by an ERISA plan participant or beneficiary against an ERISA plan fiduciary. Nor does the Removing Defendants' asserted liability "'derive[]' from 'the particular rights and obligations established by [any] benefit plan[]," *Stevenson v. Bank of N.Y. Co., Inc.*, 609 F.3d 56, 60 (2d Cir. 2010) (brackets in original) (quoting *Davila*, 542 U.S. at 213, 124 S. Ct. 2488), or "require a court to review the propriety of an administrator's or employer's determination of benefits under such a plan," *id.* at 61; *see also McCulloch*, 857 F.3d at 149-50; and the terms of the ESOP, and its operation and management, are not critical to establishing liability against the Removing Defendants. *See, e.g. McCulloch*, 857 F.3d at 149-50.

Since plaintiff's state law claims against the Removing Defendants cannot "be recast as a federal claim for relief [under ERISA]," *Wurtz*, 761 F.3d at 238 (brackets omitted), the Removing Defendants have not established complete preemption of plaintiff's state law claims against them under Section 502(a) of ERISA , nor an "alternative basis for subject-matter jurisdiction" over plaintiff's claims against them. Accordingly this Court is without jurisdiction to consider "the merits of the ordinary express preemption defense," *id.* at 239; *see, e.g. Sullivan*, 424 F.3d at 277-78 (2d Cir. 2005) ("Because it follows from our holding [of no complete preemption] that the district court lacked subject-matter jurisdiction over this case, we have no

occasion to consider the merits of [the defendant's] argument that the plaintiffs' defamation claims . . . are subject to ordinary preemption"), and plaintiff's claims against the Removing Defendants were not properly removed to this Court. Therefore, plaintiff's motion to remand this case to the state court is granted.

IV.    Conclusion

For the reasons set forth above, plaintiff's motion to remand is granted and this action is remanded to the state court pursuant to 28 U.S.C. § 1447(c). The Clerk of the Court shall mail a certified copy of this order to the clerk of the Supreme Court of the State of New York, County of Nassau, pursuant to 28 U.S.C. § 1447(c) and close this case.

**SO ORDERED.**

_____/s/ *Sandra J. Feuerstein*_____
Sandra J. Feuerstein
United States District Judge

Dated: January 13, 2020
       Central Islip, New York